## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

PATRICIA STEPHENS,

               Plaintiff,

v.

ILG, INC., CRAIG M. NASH, DAVID FLOWERS, VICKI L. FREED, LIZANNE GALBREATH, CHAD HOLLINGSWORTH, LEWIS J. KORMAN, THOMAS J. KUHN, THOMAS J. MCINERNEY, THOMAS P. MURPHY JR., STEPHEN R. QUAZZO, SERGIO D. RIVERA, THOMAS O. RYDER, and AVY H. STEIN,

               Defendants.

Civil Case No.:

## **COMPLAINT**

## **DEMAND FOR JURY TRIAL**

## COMPLAINT FOR VIOLATION OF SECTIONS 14(a) AND 20(a) OF THE
## SECURITIES EXCHANGE ACT OF 1934

Plaintiff Patricia Stephens ("Plaintiff") brings this suit for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934. In support of this Complaint, Plaintiff, by her attorneys, alleges upon information and belief, except for her own acts, which are alleged on knowledge, as follows:

## **NATURE OF THE ACTION**

1.     Plaintiff brings this action against ILG Inc. ("ILG" or the "Company") and its Board of Directors (collectively, the "Board" or the "Individual Defendants," as further defined below) for violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed sale of ILG. Specifically, Defendants are soliciting stockholder

approval in connection with the sale of the Company to Marriott Vacations Worldwide Corp ("Parent"), Ignite Holdco, Inc., Ignite Holdco Subsidiary, Inc., Volt Merger Sub, and Inc., and Volt Merger Sub, LLC (collectively with Parent, "MVW") by means of a Registration Statement that omits material facts necessary to make the statements therein not false or misleading. Stockholders need this material information to decide whether to vote in favor of the merger.

2.      On May 1, 2018, the Company announced that it had entered into a definitive agreement (the "Merger Agreement") with MVW pursuant to which MVW will acquire ILG in a mixed stock and cash transaction ("Proposed Transaction") in which MVW will acquire each outstanding share of ILG common stock for $14.75 in cash and 0.165 of its own shares for each ILG share (the "Merger Consideration"). Upon the close of the Proposed Transaction, MVW stockholders will own approximately 57% of the outstanding shares of the combined company's common stock and ILG shareholders will own approximately 43% of the combined company.

3.      In connection with the Proposed Transaction, on June 7, 2018, the Company filed a materially incomplete and misleading Form S-4 Registration Statement (the "Registration Statement") with the Securities and Exchange Commission ("SEC"). The Registration Statement is materially deficient and misleading because, *inter alia,* it fails to disclose material information relating to the Company's financial projections, as well as the analyses performed by the Company's financial advisors in connection with the Proposed Transaction, Goldman Sachs & Co. LLC ("Goldman") and Moelis & Company LLC ("Moelis"). Furthermore, the failure to disclose material information relating to potential conflicts of interest involving the Company's financial advisors calls into question whether Company stockholders can reasonably rely upon the analyses performed by the Company's financial advisors.

4.      Without all material information, ILG stockholders cannot make a fully-informed

decision regarding whether to vote for or against the Proposed Transaction. Accordingly, the failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act.

5.      For these reasons and as set forth in detail herein, the Individual Defendants have violated federal securities laws.  Plaintiff seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' violations of these laws. As the shareholder vote on the Proposed Transaction is presently scheduled for August 28, 2018, judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's stockholders.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331, pursuant to 15 U.S.C. § 78aa (federal question jurisdiction), as Plaintiff alleges violations of Section 20(a) and 14(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder.

7.      The Court has personal jurisdiction over each of the Defendants because each either is a corporation that is incorporated under the laws of, conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists. ILG is incorporated in Delaware, but maintains its administrative headquarters in this District.

Moreover, each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

## PARTIES

9.      Plaintiff is, and has been at all relevant times, the owner of shares of ILG common stock.

10.     Craig M. Nash ("Nash") has served as chairman of the board, president, and CEO of ILG since its inception in 2008.

11.     David Flowers ("Flowers") has served as a director of ILG since August 2008.

12.     Vicki L. Freed ("Freed") has served as a director of ILG since October 2012.

13.     Lizanne Galbreath ("Galbreath") has served as a director of ILG since May 2016.

14.     Chad Hollingsworth ("Hollingsworth") has served as director of ILG since February 2015.

15.     Lewis J. Korman ("Korman") has served as a director of ILG since August 2008.

16.     Thomas J. Kuhn ("Kuhn") has served as a director of ILG since August 2008.

17.     Thomas J. McInerney ("McInerney") has served as a director of ILG since May 2008.

18.     Thomas P. Murphy Jr. ("Murphy") has served as a director of ILG since August 2008.

19.     Stephen R. Quazzo ("Quazzo") has served as a director of ILG since May 2016.

20.     Sergio D. Rivera ("Rivera") has served as a director of ILG since May 2016 and President and CEO of the Company's Vacation Ownership segment since November 2016.

21.     Thomas O. Ryder ("Ryder") has served as a director of ILG since May 2016.

22.     Avy H. Stein ("Stein") has served as a director of ILG since August 2008 and as

Lead Director since December 2008.

23.     Defendants Nash, Flowers, Freed, Galbreath, Hollingsworth, Korman, Kuhn, McInerney, Murphy, Quazzo, Rivera, Ryder, and Stein are collectively referred to herein as the "Board" or the "Individual Defendants."

24.     Defendant ILG, incorporated in Delaware, has offices in 15 countries and maintains its administrative headquarters at 6262 Sunset Drive, Miami, FL 33143. ILG's common stock is traded on the NASDAQ under the symbol "ILG."

25.     ILG and the Individual Defendants are collectively referred to herein as "Defendants."

## OTHER RELEVANT ENTITIES

26.     Parent is a leading global pure-play vacation ownership company, offering a diverse portfolio of quality products, programs and management expertise with over 65 resorts. Its brands include Marriott Vacation Club, The Ritz-Carlton Destination Club and Grand Residences by Marriott. Since entering the industry in 1984 as part of Marriott International, Inc., the company earned its position as a leader and innovator in vacation ownership products. The company's stock is listed is listed on the New York Stock Exchange ("NYSE") under the trading symbol "VAC," and maintains its principal executive offices at 6649 Westwood Blvd., Suite 500, Orlando, FL 32821.

27.     Ignite Holdco, Inc. is a Delaware corporation and a party to the Merger Agreement.

28.     Ignite Holdco Subsidiary, Inc. is a Delaware corporation and a party to the Merger Agreement.

29.     Volt Merger Sub, Inc. is a Delaware corporation and a party to the Merger

Agreement.

30.     Volt Merger Sub, LLC is a Delaware limited liability company and a party to the

Merger Agreement.

## FACTUAL BACKGROUND

### Company Background and the Proposed Transaction

31.     ILG is a leading provider of professionally delivered vacation experiences and the

exclusive global licensee for the Hyatt®, Sheraton®, and Westin® brands in vacation ownership.

The Company offers its owners, members, and guests access to an array of benefits and services,

as well as world-class destinations through its international portfolio of resorts and clubs. TILG's

operating businesses include Aqua-Aston Hospitality, Hyatt Vacation Ownership, Interval

International, Trading Places International, Vacation Resorts International, VRI Europe, and

Vistana Signature Experiences. Through its subsidiaries, ILG independently owns and manages

the Hyatt Residence Club program and uses the Hyatt Vacation Ownership name and other Hyatt

marks under license from affiliates of Hyatt Hotels Corporation. In addition, ILG's Vistana

Signature Experiences, Inc., is the exclusive provider of vacation ownership for the Sheraton and

Westin brands and uses related trademarks under license from Starwood Hotels & Resorts

Worldwide, LLC.

32.     In a joint press release dated May 1, 2018, MVW and ILG announced that the two

entities had entered into the Merger Agreement.

33.     The press release states in pertinent part:

ORLANDO, Fla. and MIAMI – April 30, 2018 – Marriott Vacations Worldwide
Corporation (NYSE: VAC) ("MVW" or the "Company") and ILG, Inc., (Nasdaq:
ILG) ("ILG") today announced that they have entered into a definitive agreement
under which MVW will acquire all of the outstanding shares of ILG in a cash and
stock transaction with an implied equity value of approximately $4.7 billion.

Under the terms of the agreement, ILG shareholders will receive $14.75 in cash and 0.165 shares of MVW common stock for each ILG share.

ILG is a leading provider of premier vacation experiences with over 40 properties and over 250,000 owners in its Vistana Signature Experiences and Hyatt Vacation Ownership portfolios, as well as exchange networks that comprise nearly two million members and over 3,200 resorts worldwide. As a combined entity, MVW and ILG will be a leader in the vacation experiences industry with significant scale, an expanded presence in key leisure destinations, the largest portfolio of upper-upscale and luxury brands in the industry and world-class exchange networks. The combined company will be the global licensee of seven upper-upscale and luxury vacation brands, including Marriott Vacation Club, Grand Residences by Marriott, Ritz-Carlton Destination Club, Sheraton Vacation Club, Westin Vacation Club, St. Regis Residence Club, and Hyatt Residence Club. It will also have exclusive access for vacation ownership to the Marriott Rewards, Starwood Preferred Guest and Ritz-Carlton Rewards loyalty programs for its six Marriott vacation ownership brands. With respect to its Hyatt business, the combined company will have rights to develop, market and sell under the Hyatt Vacation Ownership programs, including access to the almost 10 million members of the World of Hyatt loyalty platform. Finally, strengthening MVW's vacation properties' affiliation with ILG's exchange networks will reinforce Interval International's industry leading position and advance our objective of creating shareholder value.

"This transaction will combine two of the premier global vacation ownership companies to create a more diversified company with significantly enhanced marketing potential and scale to drive sales growth and value for both MVW and ILG shareholders," said Stephen P. Weisz, President and Chief Executive Officer of Marriott Vacations Worldwide. "With ILG, we will bring together six world-class vacation ownership brands under one licensing relationship with Marriott International, which will enable us to leverage high-value marketing and sales channels, including those provided by Marriott International's platforms, and enhance the benefits of our access to Marriott International's loyalty programs, call transfer and hotel linkage programs. We will also diversify our vacation ownership business with the addition of the Hyatt Vacation Ownership platform, providing exciting growth opportunities outside of the Marriott and Vistana platforms. Additionally, with ILG's leading exchange networks, we will gain recurring, high-margin revenue streams."

Mr. Weisz continued, "ILG shares our dedication to customers and commitment to creating an unparalleled vacation experience for our Owners. Together, I am confident that we will be better positioned to fulfill the dreams of Owners, Members and guests around the world by providing them with memories that will last a lifetime."

"We are very pleased to achieve this outcome for shareholders, as it provides them with immediate and compelling cash value and the opportunity to meaningfully participate in the long-term growth potential of a powerful combined company," said Craig M. Nash, Chairman, President and Chief Executive Officer of ILG. "The strategic rationale for this transaction is clear. Combining these two highly complementary businesses will create an industry leader with enhanced scale and a broader product portfolio that will have great benefits for our members, owners and guests. Thanks to the dedication and hard work of our more than 10,000 talented associates around the world, we have been able to successfully adapt to changing industry dynamics throughout our history, and this transaction is another step in that evolution. MVW associates share the same values and goals that we have championed for so long, and we are confident that MVW and ILG are as strong a cultural fit as they are strategic."

**Compelling Strategic and Financial Benefits**

- **Creates a leading global luxury and upper-upscale vacation ownership operator with access to world-class loyalty programs and an expanded portfolio of highly demanded vacation destinations:** Combining MVW and ILG will create a leading global vacation ownership and exchange company comprising approximately 650,000 owners, seven upper-upscale and luxury brands, over 100 vacation properties and more than 20,000 vacation ownership units around the world. With ILG's four resorts in Mexico and one on St. John (USVI), MVW will gain an important foothold in popular vacation destinations in Mexico and expand its presence in the Caribbean. Additionally, it will diversify its long history of upper-upscale brand management with the Hyatt Residence Club properties. ILG's resort management businesses across the U.S., Caribbean, Mexico and Europe will also significantly expand MVW's resort management capabilities and scope across the globe.

- **Creates a platform to accelerate sales growth:** Through their agreements with Marriott International, MVW and ILG will have exclusive access for vacation ownership to the Marriott Rewards, Starwood Preferred Guest and Ritz-Carlton Rewards loyalty programs, which have over 100 million members and which are expected to be combined into a single loyalty program in early 2019. They will also be able to leverage the exclusive call transfer and hotel linkage rights that MVW gained through its recently amended agreement with Marriott International to drive valuable incremental tours and sales at ILG's Vistana properties, significantly enhancing the sales potential of these locations.

In addition to these opportunities, the Hyatt Vacation Ownership business will benefit from continued access to almost 10 million World of Hyatt loyalty platform members for marketing opportunities and growth in highly desirable destinations.

- **Diversifies revenues and expands margins with significant contribution from recurring and fee-based revenue streams:** The Company will benefit from premier exchange networks, which provide incremental, high-margin, recurring, fee-based revenue streams. ILG's Interval International, Vistana Signature Network, Hyatt Residence Club and Trading Places International exchange networks will comprise nearly two million members and over 3,200 resorts.

ILG's exchange networks and resort management business represent profitable revenue streams that will further diversify the Company's revenue profile and expand its margins. Additionally, owning Marriott Vacation Club, Vistana Signature Experiences and Hyatt Vacation Ownership, which on a combined basis represent over 50% of the corporate members of Interval International, will provide increased stability of cash flows from this business. The additional revenue streams that ILG would bring to the combined company would raise its total 2017 revenue to $2.9 billion while further diversifying its revenue mix.

Interval International, ILG's leading exchange business, will maintain its headquarters in Miami, Florida, where it has been based since its founding in 1976. Marriott Vacations Worldwide has deep respect for the Interval International leadership team and looks forward to working with them as the combined company take steps to grow this business into the future.

- **Transaction structure will result in a strong and flexible balance sheet to support future growth and shareholder returns:** The combination will significantly enhance and diversify MVW's cash flows. ILG will contribute strong and recurring revenue streams that will enable the combined company to maintain flexibility for continued organic growth, strategic acquisitions, continued capital returns to shareholders and de-levering. On a pro-forma basis, the combined company would have 2017 adjusted EBITDA of $737 million[1]. Over the past four years, MVW has returned $775 million to its shareholders through dividends and share repurchases, and it expects to pay a pro-forma annual dividend of $1.60 per share following the close of the transaction.

- **Immediately accretive to MVW's earnings and free cash flow profile and generates significant near-term cost savings:** The transaction is expected to be accretive to MVW's adjusted earnings per share within the first full year after close. It has identified and expects to achieve at least $75 million of annual run-rate cost savings within two years following the close of the transaction. Savings are expected to come primarily from the rationalization of redundant general and administrative, operating and public company costs.

**Integration Planning and Leadership**
Marriott Vacations Worldwide's President and Chief Executive Officer, Mr. Stephen Weisz, and its Chief Financial and Administrative Officer, Mr. John Geller, will continue to serve in their roles following the close of the transaction. The Marriott Vacations Worldwide Board of Directors will be expanded from eight to 10 members to include two current members of the ILG Board, and Mr. William Shaw will remain Chairman of the Board. MVW's headquarters will remain in Orlando, and the combined company will maintain a significant operating presence in Miami.

Following the close of the transaction, the combined company will trade on the NYSE under ticker symbol VAC.

**Transaction Details**
Under the terms of the merger agreement, which has been unanimously approved by the Boards of both companies, ILG shareholders will receive $14.75 in cash and 0.165 shares of MVW common stock for each ILG share. Following the close of the transaction, ILG shareholders will own approximately 43% of MVW's common shares on a fully-diluted basis, based on the number of MVW common shares outstanding today. Qurate Retail, Inc. has entered into a voting agreement with ILG in support of the transaction.

**The Registration Statement Omits Material Information**

34.     On June 7, 2018, ILG caused to be filed a Registration Statement with the SEC. As alleged below and elsewhere herein, the Registration Statement contains material misrepresentations and omissions of fact that must be cured to allow ILG stockholders to render an informed decision with respect to the Proposed Transaction.

35.     As discussed below, the Registration Statements omits material information regarding the Company's financial projections as well as the analyses performed by Goldman

and Moelis. Furthermore, the failure to disclose material information relating to potential conflicts of interest involving the Company's financial advisors calls into question whether Company stockholders can reasonably rely upon the analyses performed by the Company's financial advisors. Accordingly this material information directly impacts the Company's expected future value as a standalone entity, and its omission renders the statements made materially misleading and, if disclosed, would significantly alter the total mix of information available to ILG stockholders. Accordingly, ILG stockholders are being asked to vote for the Proposed Transaction without all material information at their disposal.

### *Material Omissions Concerning ILG's Financial Projections:*

36.     With respect to ILG's projected financial information, the Registration Statement omits material information pertaining to the financial projections, and the valuation analyses performed by the Board's financial advisor in connection with the Proposed Transaction.

37.     As disclosed in the Registration Statement, a summary of the ILG financial forecasts (the "ILG Financial Forecasts") was prepared by ILG's management, reviewed with ILG's Board, provided to Goldman and Moelis, and approved by ILG for their use in connection with respective financial analyses and fairness opinions rendered to ILG's Board. Included amongst these projections are projected values for Unlevered Free Cash Flow and Adjusted EBITDA, both non-GAAP accounting metrics, for projected financial information over the years 2018-2022. However, the Registration Statement omits to disclose the metrics used to calculate these non-GAAP measures or otherwise reconcile these non-GAAP projections to the most comparable GAAP measures. The omission of this information is particularly troubling for ILG shareholders. By providing projected values for Adjusted EBITDA and Unlevered Free Cash Flow without fully disclosing the line item metrics used to calculate them, or otherwise

reconciling the non-GAAP projections to corresponding GAAP measures, the provided disclosures are rendered materially incomplete and misleading.

38.     In addition to the ILG Financial Forecasts, ILG's management also prepared a summary of financial projections for the combined company (the "ILG Combined Company Financial Forecasts"), and a summary of financial projections for MVW (the "ILG-Adjusted MVW Financial Forecasts"). The ILG-Adjusted MVW Financial Forecasts, which were based on certain projections prepared by MVW's management but adjusted by ILG's management, were reviewed with ILG's Board, provided to Goldman and Moelis and approved by ILG for their use in connection with their respective financial analyses and fairness opinions rendered to ILG's Board. Similarly, the ILG Combined Company Financial Forecasts were reviewed with ILG's Board, provided to Goldman and Moelis, and approved by ILG for their use in connection with their respective financial analyses and fairness opinions rendered to ILG's Board.

39.     Similar to the ILG Financial Forecasts, both the ILG Combined Company Financial Forecasts and the ILG-Adjusted MVW Financial Forecasts include projected values for non-GAAP accounting metrics Unlevered Free Cash Flow and Adjusted EBITDA, but omit to disclose the metrics used to calculate these non-GAAP measures or otherwise reconcile these non-GAAP projections to the most comparable GAAP measures. However, by providing projected values for Adjusted EBITDA and Unlevered Free Cash Flow without fully disclosing the line item metrics used to calculate them, or otherwise reconciling these non-GAAP projections to corresponding GAAP measures, the provided disclosures are rendered materially incomplete and misleading.

40.     The Registration Statement must disclose the necessary line items to reconcile these non-GAAP measures to a well-understood GAAP financial metric. Non-GAAP measures

have no universally understood definition and vary widely between companies depending on the needs of management in promoting their own effect on Company performance. The unreliability of these measures are seemingly confirmed within the Registration Statement itself.  In fact, with regard to Adjusted EBITDA, the Registration Statement notes that "Adjusted earnings before interest, taxes, depreciation and amortization ("Adjusted EBITDA") is a non-GAAP financial measure and should not be considered as an alternative to operating income or net income as a measure of operating performance or cash flows or as a measure of liquidity."

41.     The omission of this material information renders the Registration Statement false and misleading, including, *inter alia*, the following sections of the Registration Statement: (i) "ILG's Reasons for the Combination Transactions; Recommendation of ILG's Board;" (ii) "Opinions of ILG's Financial Advisors;" and (iii) "Certain ILG Financial Forecasts."

### Material Omissions Concerning the Financial Advisors' Financial Analyses

42.     The Registration Statement describes Goldman's and Moelis' respective fairness opinions and the various valuation analyses each performed in support of their respective opinions. However, the description of the fairness opinions and the underlying analyses omits key inputs and assumptions of ILG underlying these analyses. Without this information, as described below, ILG public stockholders are being misled as to what weight, if any, to place on the financial advisors' fairness opinions in determining whether to vote in favor of the Proposed Transaction.  This omitted information, if disclosed, would significantly alter the total mix of information available to ILG stockholders.

43.     Specifically, the Registration Statement discloses that Goldman conducted an illustrative discounted cash flow analysis for both ILG and the contemplated combined company. However, with respect to respect to Goldman's *Illustrative Discounted Cash Flow Analysis—*

13

*ILG Standalone*, the Registration Statement fails to disclose: (i) the range of illustrative terminal values for ILG; (ii) the total number of fully diluted outstanding shares of ILG; and (iii) the specific inputs and assumptions underlying the discount rates ranging from 9.5% to 11.0% and the perpetuity growth rates ranging from 2.0% to 3.0%.

44.     Similarly, with regard to Goldman's *Illustrative Discounted Cash Flow Analysis—Pro Forma Combined Company*, the Registration Statement fails to disclose: (i) the range of illustrative terminal values for the pro forma combined company; (ii) the total number of fully diluted outstanding shares of the pro forma combined company; and (iii) the specific inputs and assumptions underlying the discount rates ranging from 10.0% to 11.5% and the perpetuity growth rates ranging from 2.0% to 3.0%.

45.     With respect to Goldman's *Illustrative Present Value of Future Stock Price Analysis—ILG Standalone*, the Registration Statement fails to disclose: (i) the estimate of ILG's future net debt; (ii) the projected total number of fully diluted shares of ILG estimated to be outstanding; and (iii) the specific inputs and assumptions underlying the illustrative discount rate of 11.4%.

46.     With respect to Goldman's *Illustrative Present Value of Future Stock Price Analysis—Pro Forma Combined Company; Implied Premium*, the Registration Statement fails to disclose: (i) the estimate of the pro forma combined company's future net debt; (ii) the projected total number of fully diluted shares of the pro forma combined company estimated to be outstanding; and (iii) the specific inputs and assumptions underlying the illustrative discount rate of 12.0%.

47.     With respect to Goldman's *Premia Paid Analysis*, the Registration Statement fails to disclose the transactions observed by Goldman in the analysis as well as the premiums paid in

14

such transactions.

48.     Goldman is not alone in failing to properly disclose key inputs and assumptions of ILG underlying its respective fairness opinions and the various valuation analyses. With respect to Moelis's *Discounted Cash Flow Analysis of ILG*, the Registration Statement fails to disclose: (i) ILG's management's estimated cash tax rates; (ii) the range of estimated terminal values; (iii) the diluted share information used by Moelis in the analysis; and (iv) the specific inputs and assumptions underlying the range of discount rates of 9.50% to 11.0% and the perpetuity growth rate ranges of 1.1% to 3.7%.

49.     With respect to Moelis's *Discounted Cash Flow Analysis of Marriott*, the Registration Statement fails to disclose: (i) Marriott's management's estimated cash tax rates; (ii) the range of estimated terminal values; (iii) the diluted share information used by Moelis in the analysis; and (iv) the specific inputs and assumptions underlying the range of discount rates of 9.50% to 11.0% and the perpetuity growth rate ranges of 1.8% to 4.2%.

50.     Finally, with regard to Moelis's *Pro Forma Discounted Cash Flow Analysis*, the Registration Statement fails to disclose the diluted share information used by Moelis in the analysis.

51.     When a bankers' endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses are crucial to a fair presentation of the material facts. Furthermore, the disclosure of projected financial information provides stockholders with the best basis to project the future financial performance of a company, and allows stockholders to understand the financial analyses performed by the company's financial advisor in support of its fairness opinion. This information is therefore material, and must be

disclosed if ILG stockholders are to make a fully informed decision. The omission of this information renders the statements made concerning the financial advisors' analyses and opinions materially misleading.

52.     Without such omitted information, ILG stockholders cannot evaluate for themselves whether the financial analyses performed by either financial advisor were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction. In other words, full disclosure of the omitted information identified above is required in order to ensure that stockholders can evaluate the extent to which Goldman's and Moelis' respective opinions and analyses should factor into their decision whether to vote in favor of or against the Proposed Transaction.

53.     Here, the omission of this information renders certain portions of the Registration Statement materially misleading, including, inter alia, the following sections of the Registration Statement: (i) "ILG's Reasons for the Combination Transactions; Recommendation of ILG's Board;" (ii) "Opinions of ILG's Financial Advisors;" and (iii) "Certain ILG Financial Forecasts."

***Material Omissions Concerning the Financial Advisors' Conflicts of Interest:***

54.     Further complicating the issues identified above relating to Goldman's and Moelis' respective opinions and analyses, is the lack of clarity regarding potential conflicts of interest involving the Company's financial advisors.

55.     Disclosure of "any compensation received or to be received as a result of the relationship between" a financial advisor and the subject company or its affiliates is required pursuant to 17 C.F.R. § 229.1015(b)(4). Such information is also material to ILG shareholders. It is imperative for shareholders to be able to understand what factors might influence the financial

advisor's analytical efforts. A financial advisor's own proprietary financial interest in a proposed transaction must be carefully considered when assessing how much credence to give its analysis. A reasonable shareholder would want to know what important economic motivations that the advisor, employed by a board to assess the fairness of the merger to the shareholders, might have. This is especially true when that motivation could rationally lead the advisor to favor a deal at a less than optimal price, because the procession of a deal was more important to them— given their overall economic interest—than only approving a deal at truly fair price to shareholders.

56.     Accordingly, as a result of the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives, full disclosure of investment banker compensation and all potential conflicts is necessary for stockholders to have a materially complete sense of the conflicts of interests operating in the background. However, with regard to Goldman, the Registration Statement fails to fully disclose whether Goldman has performed services for ILG's or MVW's affiliates in the past two years, as well as the nature of such services and the amount of compensation Goldman received for providing such services. Instead, stockholders are simply informed that:

> On November 6, 2017, Goldman Sachs confirmed to ILG's Board that it had not recognized any fees for financial advisory and underwriting services provided by its investment banking division to MVW over the previous two years. Goldman Sachs also provided ILG's Board with a summary of the financial advisory and underwriting services provided by its investment banking division to Qurate Retail and/or certain affiliates and related entities of a significant stockholder of Qurate Retail, other than ILG, over the previous two years.

Registration Statement at 66. This disclosure, which occurred in November of 2017, before Goldman Sachs was even retained by ILG, is insufficient and outdated. Stockholders are misled as to the reliability of a financial advisor's fairness opinion without full disclosure of an

investment banker's potential conflicts.  Such disclosure is necessary due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives. Accordingly, the omission of any information specifically noting whether such conflicts of interests currently exist renders the statements made concerning the banker's fairness opinions misleading.

57.     Similarly, with regard to Moelis, the Registration Statement simply notes that:

> Moelis has provided investment banking and other services to ILG unrelated to the Combination Transactions and in the future may provide such services to MVW and has received and may receive compensation for such services. In the past two years prior to the date of the opinion, Moelis acted as financial advisor to ILG in connection with its acquisition of Vistana Signature Experiences, Inc., which acquisition was consummated in May 2016. In connection with the Vistana acquisition, Moelis received a fee of $8,000,000 from ILG and was reimbursed by ILG for certain expenses arising out of its engagement.

Registration Statement at 98. Missing from this disclosure is any information as to whether the financial advisor has performed services for Marriott or its affiliates in the past two years, as well as the nature of such services and the amount of compensation Moelis received for providing such services.

58.     Here, the omission of this information renders certain portions of the Registration Statement materially misleading, including, inter alia, the following sections of the Registration Statement: (i) "ILG's Reasons for the Combination Transactions; Recommendation of ILG's Board;" (ii) "Opinions of ILG's Financial Advisors;" and (iii) "Certain ILG Financial Forecasts."

59.     Based on the foregoing, the Registration Statement violates Section 14(a) of the Exchange Act and applicable SEC regulations by materially misleading ILG stockholders. ILG public shareholders lack critical information necessary to evaluate the Proposed Transaction. Moreover, without the key financial information and related disclosures, ILG public shareholders cannot gauge the accuracy and reliability of the financial analyses performed by the financial

advisors, and whether they can reasonably rely on the financial advisors' fairness opinions.

60.     Accordingly, Plaintiff seeks, among other things, the following relief: (i) enjoinment of the Proposed Transaction; or (ii) rescission of the Proposed Transaction in the event that it is consummated and to recover damages resulting from Defendants' misconduct.

## CLAIMS FOR RELIEF

## COUNT I

**Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder**

61.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

62.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

63.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy statement communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

64.     Furthermore, Item 1015 of Regulation M-A requires "[a]ny report, opinion or appraisal relating to the consideration or the fairness of the consideration to be offered to security holders or the fairness of the transaction to the issuer or affiliate or to security holders who are

not affiliates" to "[d]escribe any material relationship that existed during the past two years or is mutually understood to be contemplated and any compensation received or to be received as a result of the relationship between: (i) The outside party, its affiliates, and/or unaffiliated representative; and (ii) The subject company or its affiliates." 17 CFR 229.1015.

65.      The omission of information from a registration statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

66.      Here, Defendants have issued the Registration Statement with the intention of soliciting stockholder support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Registration Statement, which fails to provide critical information regarding, amongst other things: (i) the Company's financial projections; (ii) the valuation analyses performed by the Company's financial advisors, in support of their fairness opinions; and (iii) the potential conflicts of interest involving the financial advisors.

67.      In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Registration Statement, but nonetheless failed to obtain and disclose such information to ILG common stockholders although they could have done so without extraordinary effort.

68.      The Individual Defendants knew or were negligent in not knowing that the Registration Statement is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Registration Statement notes that the financial advisors reviewed and discussed their financial analyses with the Board, and further

states that the Board considered the financial analyses provided by the financial advisors, as well as their respective fairness opinions and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Registration Statement, rendering the sections of the Registration Statement identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review the financial advisors' analyses in connection with their receipt of the fairness opinion, question the advisors as to the derivation of fairness, and be particularly attentive to the procedures followed in preparing the Registration Statement, and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

69.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Registration Statement. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Registration Statement or failing to notice the material omissions in the Registration Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

70.     ILG is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Registration Statement.

71.     The misrepresentations and omissions in the Registration Statement are material to Plaintiff and ILG stockholders, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. Plaintiff and the ILG stockholders have no adequate remedy at law. Only through

the exercise of this Court's equitable powers can Plaintiff and the ILG stockholders be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### Against the Individual Defendants for
### Violations of § 20(a) of the 1934 Act

72.      Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

73.      The Individual Defendants acted as controlling persons of ILG within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of ILG and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

74.      Each of the Individual Defendants was provided with, or had unlimited access to, copies of the Registration Statement alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

75.      In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction. The Registration Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  Thus, the Individual Defendants were directly involved in the creation of the Registration Statement.

76.     The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

77.     By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the 1934 Act.

78.     As set forth above, the Individual Defendants had the ability to exercise control over, and did control, a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, Plaintiff is threatened with irreparable harm.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants jointly and severally, as follows:

(A)     declaring that the Registration Statement is materially false or misleading;

(B)     enjoining, preliminarily and permanently, the Proposed Transaction;

(C)     in the event that the Proposed Transaction is consummated before the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

(D)     directing that Defendants account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties.

(E)     awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(F)     granting Plaintiff such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


Dated:  July 13, 2018

Respectfully submitted,

**KOMLOSSY LAW P.A.**

/s/ Emily C. Komlossy
Emily Komlossy (FBN 7714)
eck@komlossylaw.com
Ross A. Appel (FBN 90865)
raa@komlossylaw.com
4700 Sheridan St., Suite J
Hollywood, FL 33021
Phone: (954) 842-2021
Fax: (954) 416-6223


**LEVI & KORSINSKY LLP**
Donald J. Enright (to be admitted *pro hac vice*)
Elizabeth K. Tripodi (to be admitted *pro hac vice*)
1101 30th Street, N.W., Suite 115
Washington, D.C. 20007
Telephone: (202) 524-4290
Facsimile: (202) 333-2121
Email: denright@zlk.com
         etripodi@zlk.com


*Attorneys for Plaintiff*